```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF OHIO
 3                   WESTERN DIVISION
 4                      *   *   *
 5   MIRACLE HURSTON,
 6           Plaintiff,
 7       vs.                    CASE NO. 1:07CV449
 8   THE CITY OF SPRINGBORO OHIO,
 9   et al.,
10           Defendants.
11                      *   *   *
12           Deposition of JONATHAN D. WHEELER,
13   Defendant herein, called by the Plaintiff for
14   cross-examination pursuant to the Rules of
15   Civil Procedure, taken before me, Melissa A.
16   Neary, a Notary Public and Registered
17   Professional Reporter in and for the State of
18   Ohio, at the offices of The Springboro City
19   Building, 425 Pioneer Drive, Springboro,
20   Dayton, Ohio, on Wednesday, April 9, 2008, at
21   10:32 a.m.
22                      *   *   *
23
24
25
```

Page 2

1 APPEARANCES:
2    On behalf of the Plaintiff:
3       Law Offices of James E. Kolenich
4       James E. Kolenich
       Attorney at Law
5       9435 Waterstone Boulevard
       Suite 140
6       Cincinnati, Ohio 45249
7    On behalf of the Defendants:
8       Rendigs, Fry, Kiely & Dennis
9       Wilson G. Weisenfelder, Jr.
       Attorney at Law
10      One West Fourth Street
       Suite 900
11      Cincinnati, Ohio 45202
12
13 ALSO PRESENT:
14    Terry Dunkel
15       * * *

Page 3

1      JONATHAN D. WHEELER
2 of lawful age, Defendant herein, having been
3 first duly cautioned and sworn, as hereinafter
4 certified, was examined and said as follows:
5      CROSS-EXAMINATION
6 BY MR. KOLENICH:
7    Q. Lieutenant, my name is Jim Kolenich.
8 I represent the plaintiff in this matter,
9 Mr. Hurston. You've testified in court before?
10   A. Yes.
11   Q. Okay. So it's just like that.
12 Answer verbally rather than nodding your head
13 and so forth. State your name and spell your
14 last name.
15   A. Jonathan Dale Wheeler, W H E E L E R.
16   Q. Thank you. How long have you been a
17 policeman, sir?
18   A. Seventeen years.
19   Q. Did you start out with Springboro?
20   A. No, I didn't. I started out with
21 Warren County Sheriff's Department as a special
22 deputy.
23   Q. Is that a corrections officer?
24   A. No. It's a deputy sheriff, volunteer
25 deputy sheriff, dollar a year guy. After about

Page 4

1 six months of that, I moved to Clearcreek
2 Township PD.
3    MR. WEISENFELDER: Where?
4    THE WITNESS: Clearcreek Township.
5 Springboro sits in Clearcreek Township.
6 Clearcreek is the outlying area.
7   Q. How long have you been with
8 Springboro?
9   A. Better than 14 years, I think. About
10 14.
11   Q. All right. So you started out at
12 Warren County Sheriff's, then you went to
13 Clearcreek and Springboro?
14   A. Right.
15   Q. That's the only three places you've
16 worked as a policeman?
17   A. Correct.
18   Q. What did you do before you were a
19 policeman?
20   A. School teacher.
21   Q. Were you?
22   A. Right, uh-huh.
23    MR. WEISENFELDER: I'm going to
24 caution you on one thing. She can't take down
25 uh-huh. It has to be yes, oral or out loud.

Page 5

1    THE WITNESS: Okay.
2    MR. KOLENICH: Actually, this
3 particular reporter is good at that. She has a
4 key for uh-huh. Okay. Well, this is the Rule
5 30 witness, right?
6    MR. WEISENFELDER: Yes.
7   Q. Lieutenant, do you know an attorney
8 named John Sharts? Do you remember him?
9   A. Yes, I do.
10   Q. He used to be the prosecutor here in
11 Springboro?
12   A. Yes.
13   Q. To your knowledge, did your patrol
14 officers have any difficulty with Mr. Sharts,
15 working with him?
16    MR. WEISENFELDER: Objection as to
17 the form. Go ahead and answer, if you can.
18    THE WITNESS: When you say
19 difficulties, I'm not sure what you mean. Can
20 you be a little more specific?
21   Q. Did Mr. Sharts throw out an abnormal
22 number of their cases?
23   A. I would not say an abnormal number,
24 no. No. We had -- like any relationship with
25 a prosecutor, we had tickets that would be

Page 6

1 reduced, dismissed, just because of docket
2 space and necessity. Sometimes it was because
3 of the ticket itself, but normally it was just
4 due to the normal operation of the court.
5  Q. Okay. Patrolman Dunkel here just
6 testified that he stopped a particular citizen,
7 the plaintiff, Mr. Hurston, twice, and both
8 times the ticket was thrown out. Would that be
9 unusual, in your experience?
10   MR. WEISENFELDER: Objection.
11   MR. KOLENICH: Can he answer?
12   MR. WEISENFELDER: You can answer.
13   THE WITNESS: I don't know that it's
14 unusual. The officer's job is to write a
15 ticket that's based on probable cause. The
16 prosecutor's job is to take that ticket and get
17 it through the court process. And that might
18 be -- that might include a dismissal, might
19 include a reduction, might include trial.
20 Those were some of the options that he had in
21 front of him, and he chose to exercise that
22 option.
23  Q. The information I have, Mr. Sharts
24 dismissed one and Mr. Tepe, is it, the new
25 prosecutor, dismissed the other one.

Page 7

1  A. Yes.
2  Q. So that doesn't raise any kind of red
3 flag?
4  A. It doesn't with me, no.
5  Q. Okay.
6  A. Not with this officer sitting here.
7   MR. WEISENFELDER: Wait until there's
8 a question.
9  Q. Well, let's go into this. Officer
10 Dunkel is a good officer, right?
11  A. Yes, he is.
12  Q. He doesn't have any abnormal
13 discipline problems?
14  A. No.
15  Q. I heard he was ticketed for speeding
16 once. I don't know what that's about. I'm
17 originally from Cleveland and know several
18 policemen up there. They would find that
19 rather unbelievable. Anyway, how do you -- are
20 you familiar with the training that policemen
21 are given here in Springboro?
22  A. Yes, I am.
23  Q. Particular to the patrol division?
24  A. Yes.
25  Q. Let's talk a little bit about that.

Page 8

1  How frequently are they trained on issues like
2 probable cause to stop a citizen?
3  A. We don't have a set period where an
4 officer has to be trained every three months or
5 whatever on probable cause. They receive
6 ongoing training every month on a variety of
7 issues, including probable cause for stops and
8 those type of traffic-related issues.
9  Q. Okay. Do you use the phrase probable
10 cause or do you use reasonable suspicion?
11  A. We use both interchangeably at times.
12 I shouldn't say interchangeably. We use both
13 phrases when appropriate.
14  Q. Is it your understanding that
15 actually reasonable suspicion is all that's
16 necessary to stop a citizen?
17   (Phone ringing.)
18   THE WITNESS: I'm sorry.
19  Q. It's all right if you have to take a
20 call.
21  A. No. Depending upon the circumstances
22 and the type of incident, you know, we would
23 use that phrase appropriately.
24  Q. Okay. All right. Would your men be
25 trained to consider a defective plate light as

Page 9

1 sufficient cause to stop a citizen?
2  A. Yes.
3  Q. Why would that be?
4  A. Because it is a violation of the law.
5  Q. Once they have made such a stop, are
6 they supposed to issue a citation for that
7 or -- that's the question.
8  A. That's at their discretion, whether
9 they issue a citation for that particular
10 violation. That would be up to them.
11  Q. Is there any training that assists
12 them in how to use that discretion?
13  A. Well, we are clear with our officers
14 that we want them to use good common sense, but
15 when they feel that a citation is appropriate,
16 we encourage them to issue that citation.
17  Q. Okay. So basically they have
18 discretion, if they pull over my wife with all
19 my kids in the car, she's not otherwise mouthy,
20 they can let her slide, they are not under
21 orders to site this poor woman to court?
22  A. They could. They could do either
23 one.
24  Q. They could. All right. Is it your
25 understanding that the sort of minor stops

Page 10

1 might be used as an opportunity to observe the
2 citizen in his vehicle and perhaps come up with
3 some more serious criminal behavior?
4    MR. WEISENFELDER: Objection. Go
5 ahead.
6    THE WITNESS: The violation stands on
7 its own merit. It's a violation of the law.
8 It's an opportunity for the officer to stop the
9 vehicle and deal with the violation. If that
10 leads to other violations, then that's what it
11 leads to.
12    Q. Okay. So when they make a stop for
13 the plate light or whatever, that's all they
14 are about, they just want to go see the plate
15 light? And if they happen to find a drunk
16 driver, they deal with that, but --
17    A. Again, we look at that violation as a
18 violation of the law. It's in the Ohio Revised
19 Code, and they are encouraged to stop all
20 violations of the law. If that leads to other
21 violations, then those will be dealt with
22 accordingly.
23    Q. Okay. Thank you. Just so I'm clear,
24 by encouraged -- now my cell phone is ringing.
25 What do you mean by encouraged?

Page 11

1    A. We want our officers to take action
2 on violations, at the very least a verbal
3 warning, and up to a citation, if it's a minor
4 misdemeanor. If it's above that, then it would
5 be an arrest, could be.
6    Q. I'm sorry?
7    A. I'm saying it could be an arrest if
8 it's above a minor misdemeanor.
9    Q. Is a plate light violation above a
10 minor misdemeanor?
11    A. No, not on the first offense.
12    Q. Is there any way for a patrol officer
13 to know if it's a first offense or not right
14 there on the street?
15    A. Yes. They can pull up the driving
16 record and see the driving record right on
17 scene on the MDT.
18    Q. You have the MDTs in your car?
19    A. Yes.
20    Q. How much, again, if you know, are you
21 directly involved in patrol supervision?
22    A. Not at this time.
23    Q. You used to be?
24    A. Yes.
25    Q. How much would you say your guys, at

Page 12

1 least when you used to be the patrol
2 supervisor, pulled people over for weaving
3 around in a lane or between lanes?
4    A. I couldn't --
5    MR. WEISENFELDER: Objection to form.
6 Go ahead.
7    THE WITNESS: I couldn't give you a
8 number, but it was not uncommon.
9    Q. Okay. And would that often have been
10 the only citation issued or the only violation
11 that they found in those circumstances?
12    A. I really wouldn't know the answer to
13 that question. I would have to go back and
14 look at each time, you know, to look at what
15 happened on each occasion.
16    Q. So that isn't something you would
17 have followed up on as a patrol supervisor?
18    A. Not necessarily. If the paperwork is
19 in order and the probable cause is there for
20 the stop, then the paperwork would proceed to
21 court. I wouldn't necessarily scrutinize on
22 whether there was a subsequent citation after a
23 weaving stop.
24    Q. Now, by paperwork in order, what do
25 you mean?

Page 13

1    A. Citations, reports, printouts.
2    Q. Okay. And by probable cause, you
3 mean did the officer write down something
4 sufficient to justify a stop?
5    A. Yes.
6    Q. Okay. So your determination of
7 whether the paperwork is in order and probable
8 cause exists is exclusively based on what your
9 patrol officers tell you?
10    A. At that time. I mean, we have video
11 in some of these stops. Since that date, we
12 can go back and look at video if we think
13 something is not right, but we go by the
14 officer's statement. We trust our officers to
15 make those decisions.
16    Q. So when an officer pulls over the
17 same citizen twice and both times it's
18 dismissed, that doesn't get looked at?
19    MR. WEISENFELDER: Objection. You
20 can answer.
21    THE WITNESS: Officer Dunkel has my
22 faith and I trust him completely doing his job.
23 He's never given me a reason to doubt his
24 integrity or his ability to make decisions on
25 the street.

4 (Pages 10 to 13)

Page 14

```
1    Q.  So the fact that it didn't get looked
2  at is based on Officer Dunkel in particular as
3  opposed to any objective standard?
4    A.  This situation that you are talking
5  about involves Officer Dunkel.  He has my faith
6  and my trust, and I believe that after talking
7  to him that he made the right decision on the
8  street.
9    Q.  So you talked to him about the case?
10   A.  I had discussed with him the
11 incident, yes.
12   Q.  What did you discuss?
13   A.  For him to explain what happened.
14   Q.  And what did he say?
15   A.  He said that he stopped the car
16 because the car was weaving and that it was a
17 good probable cause stop, and that he issued a
18 citation.
19   Q.  Why did you ask him about this?
20   A.  Because I had received a phone call
21 from Mr. Hurston.
22   Q.  Mr. Hurston called and complained?
23   A.  Yes.
24   Q.  Okay.  So you asked Dunkel what
25 happened, and he said, he was weaving so I
```

Page 15

```
1  stopped him?
2    A.  Yes.
3    Q.  And that was that?
4    A.  Yes.
5    Q.  You didn't ask to look at the cruiser
6  cam?
7    A.  There was no cruiser cam.
8    Q.  Well, there's two stops, and Officer
9  Dunkel has testified on one of them there is,
10 in fact, cruiser cam.
11   A.  Yes.  The stop I'm referring to was
12 in 2005.  There was no cruiser cam in 2005 in
13 that vehicle.
14   Q.  Mr. Hurston never complained about
15 the 2007 stop?
16   A.  He may have.  That's just prior to me
17 leaving for active duty in the military, and I
18 don't recall whether I was involved in that or
19 not.  I may or may not have been.  I don't
20 remember talking to him on that occasion.  I do
21 remember talking to him on the 2005 occasion.
22   Q.  Okay.  If you had cruiser cam
23 evidence or any other evidence contradicting
24 the officer's testimony, what would happen?
25 Not specific to Dunkel, but just generically,
```

Page 16

```
1  any officer.
2    A.  We would investigate that.
3    Q.  Let's say there was a cruiser cam
4  that directly contradicted a particular
5  officer's version of events such that it's not
6  really reasonable to think that that officer
7  was telling the truth when he testified.  What
8  would happen?
9    A.  We would investigate that.
10   Q.  If you found those facts to be true,
11 what would happen?
12   A.  There could be discipline.
13   Q.  So that would still be discretionary
14 discipline?
15   A.  Right.
16   Q.  Okay.  The chief just might give him
17 a tongue lashing and let it slide?
18   A.  If we have an officer that's being
19 dishonest, that's dealt with strictly and
20 severely.
21   Q.  Your police officers belong to a
22 patrolmen's union; is that correct?
23   A.  Yes.
24   Q.  Is there a union bargaining
25 disciplinary process here?
```

Page 17

```
1    A.  Yes.
2    Q.  What does it consist of?
3    A.  A series of reprimands.  At the
4  lowest level, it would be a documented verbal
5  reprimand.  The next level would be a written
6  reprimand, which would include details of the
7  offense.  It would proceed on to possible
8  suspension, up to termination.
9    Q.  Along that continuum, where would
10 intentional dishonesty fall?
11   A.  Intentional dishonesty would be up
12 there at termination.
13   Q.  Okay.  My client, Mr. Hurston,
14 alleges that he's been stopped something on the
15 order of seven times by Springboro policemen,
16 one of which resulted in a conviction for him
17 on speeding, so that's not a part of this case.
18 I believe that was fairly recent.
19      The other six times, or approximately
20 six times, either he wasn't issued any citation
21 at all or in two cases Officer Dunkel cited him
22 and the prosecutor, one Mr. Sharts and one
23 Mr. Tepe, dismissed them.  Does that -- does
24 that raise any red flags for you.
25   A.  No.
```

Page 34

1  Officer Dunkel was to discuss the probable
2  cause for the stop and then to ask about how
3  the stop was finished or concluded, and based
4  on that, I believe Officer Dunkel acted
5  properly.
6      Q. Based on what Officer Dunkel said?
7      A. Yes.
8      Q. What did the citizen say when he
9  complained? Or was it just some rant into your
10 voicemail?
11     A. We talked on the phone. I actually
12 met with Mr. --
13     Q. Hurston.
14     A. -- Hurston early on, I believe it was
15 2005, and discussed it with him in person.
16     Q. Do you recall what he said?
17     A. He was upset about the stop. He felt
18 that he was being harassed. I don't recall the
19 exact words of what we talked about, but we did
20 talk and discuss it in person.
21     Q. Okay. Did you explain to Mr. Hurston
22 the reasons why he was stopped?
23     A. At that point I had talked to Officer
24 Dunkel. I believe I met with Officer Dunkel
25 after the discussion with Mr. Hurston.

Page 36

1  accurate?
2      A. It is.
3      Q. Who holds that discretion?
4      A. The supervisor can look at that. I
5  could look at that. The operations commander
6  could look at that. Chief could look at that.
7      Q. How many different -- well, let's
8  start with the chief. You have one chief of
9  police?
10     A. Yes.
11     Q. Do you have any deputy chiefs?
12     A. I am the lieutenant. I'm the
13 administrative lieutenant.
14     Q. So you are sort of second to the
15 chief?
16     A. Yes, in the chain of command, I
17 guess, essentially, yes.
18     Q. Are there any other lieutenants?
19     A. We have an operations lieutenant.
20     Q. He's your equal in rank?
21     A. Equal in rank, yes.
22     Q. And then below you two are, what,
23 patrol, watch commanders, sergeants?
24     A. Four sergeants. We have a sergeant
25 in schools who works as a school resource

Page 35

1      Q. Okay. Just so I'm clear, there's no
2  procedure between the Springboro Police
3  Department for reviewing the frequency with
4  which any individual citizen is ticketed or
5  stopped?
6      A. No.
7      Q. That wouldn't be -- you don't see the
8  need for such a procedure?
9      A. There's not an automatic process that
10 would tell us how many times each individual is
11 stopped while in the jurisdiction of our police
12 department.
13     Q. The officers are routinely trained as
14 to probable cause for stops, among other
15 things?
16     A. Yes. Let me correct that last
17 statement I said. We have the ability to go in
18 and look at stops. There is not an automatic
19 system that would flag us if a person had been
20 stopped, say, more than five or six times. I
21 don't want that to be confusing. We do have a
22 way to go in and look at different stops at
23 different times if we want to.
24     Q. Okay. And whether you do that or not
25 would probably be discretionary; is that

Page 37

1  officer, and then we have three sergeants that
2  are over patrol.
3      Q. And then you have patrol officers?
4      A. Yes.
5      Q. So the sergeants, two lieutenants,
6  and chief, that would be who holds this
7  discretion?
8      A. Yes.
9      Q. Are there any rules or guidelines
10 governing that discretion and how you are
11 supposed to exercise it?
12     A. Discretion as to what? Clarify that
13 for me.
14     Q. Whether to investigate the frequency
15 of how many times a citizen is stopped or
16 anything else in regards to a citizen
17 complaint.
18     A. If a complaint comes in, if an
19 individual complains on an officer's
20 performance, whether it be on a traffic stop or
21 whatever other situation they met the officer,
22 we would look into that situation, and that
23 investigation would begin with the sergeant.
24 So it's customary for the supervisor to
25 investigate any alleged misconduct.

M. SUE LOPREATO REPORTING
PHONE (513) 871-9588   FAX (513) 871-9566

3b511020-1c07-11dd-b2a8-44455