```
 1                UNITED STATES DISTRICT COURT
 2                 SOUTHERN DISTRICT OF OHIO
 3                     WESTERN DIVISION
 4                         *   *   *
 5  MIRACLE HURSTON,
 6          Plaintiff,
 7     vs.                       CASE NO. 1:07CV449
 8  THE CITY OF SPRINGBORO OHIO,
 9  et al.,
10          Defendants.
11                         *   *   *
12          Deposition of THOMAS FAULKNER,
13  Defendant herein, called by the Plaintiff for
14  cross-examination pursuant to the Rules of
15  Civil Procedure, taken before me, Melissa A.
16  Neary, a Notary Public and Registered
17  Professional Reporter in and for the State of
18  Ohio, at the offices of The Springboro City
19  Building, 425 Pioneer Drive, Springboro,
20  Dayton, Ohio, on Wednesday, April 9, 2008, at
21  3:33 p.m.
22                         *   *   *
23
24
25
```

Page 2

1  APPEARANCES:
2      On behalf of the Plaintiff:
3          Law Offices of James E. Kolenich
4          James E. Kolenich
             Attorney at Law
5          9435 Waterstone Boulevard
             Suite 140
6          Cincinnati, Ohio 45249
7      On behalf of the Defendants:
8          Rendigs, Fry, Kiely & Dennis
9          Wilson G. Weisenfelder, Jr.
             Attorney at Law
10         One West Fourth Street
             Suite 900
11         Cincinnati, Ohio 45202
12
13 ALSO PRESENT:
14     Terry Dunkel
15            * * *
16
17
18
19
20
21
22
23
24
25

Page 3

1          THOMAS FAULKNER
2  of lawful age, Defendant herein, having been
3  first duly cautioned and sworn, as hereinafter
4  certified, was examined and said as follows:
5          CROSS-EXAMINATION
6  BY MR. KOLENICH:
7      Q. Officer, good afternoon.
8      A. Good afternoon.
9      Q. Would you state your name and spell
10 your last name for the record, please?
11     A. Tom Faulkner, F A U L K N E R.
12     Q. So your first name is Tom?
13     A. Yes.
14     Q. Is that Thomas?
15     A. Thomas.
16     Q. How long have you been a policeman?
17     A. Three years.
18     Q. All with Springboro?
19     A. No. I started in Clay Township.
20        MR. WEISENFELDER: Started where?
21        THE WITNESS: Clay Township.
22     Q. Where did you go to the police
23 academy?
24     A. Sinclair.
25     Q. Are you a patrolman?

Page 4

1      A. Yes.
2      Q. Are you off duty today?
3      A. Yes.
4      Q. Sorry.
5          MR. WEISENFELDER: You have to keep
6  your voice up so everybody can hear you.
7          THE WITNESS: Okay.
8      Q. What shift are you currently working?
9      A. Night shift, third shift.
10     Q. 11:00 to 7:00?
11     A. 11:00 to 7:00, yes.
12     Q. How long have you been on that shift?
13     A. Since first of the year.
14     Q. Okay. Before that what shift?
15     A. Second shift. It would be 3:00 to
16 11:00.
17     Q. Okay. Are you familiar with the
18 plaintiff in this case? He's a man named
19 Miracle Hurston.
20     A. Vaguely.
21     Q. Did you ever participate in a traffic
22 stop involving Mr. Hurston?
23     A. I believe I did. I don't have any
24 record or --
25     Q. Okay. You don't have any specific

Page 5

1  memory of Mr. Hurston?
2      A. Right.
3      Q. And as far as you know, then, you
4  never ticketed him?
5      A. Right.
6      Q. Do you remember the prior Springboro
7  city prosecutor, a man named Mr. Sharts?
8      A. Yes.
9      Q. By the way, is Shartz Road named
10 after him?
11     A. I don't know.
12     Q. To your knowledge, you said you've
13 been an officer for three years?
14     A. Uh-huh.
15     Q. Would you say that there's any
16 tendency among Springboro police officers to
17 pull over young black males?
18     A. No.
19     Q. Pull over young males at all?
20     A. Young males? No.
21     Q. Of any race?
22     A. No.
23     Q. Just young people?
24     A. No.
25     Q. How about people driving older,

Page 18

1 citizen with, would they usually talk to you
2 about that ahead of time?
3     A.  Depends on who it is, prosecutor.
4     Q.  Let's say Mr. Sharts.
5     A.  On occasion he did not, no.
6     Q.  So it wasn't his practice to talk to
7 you first?
8     A.  Many times, no.
9     Q.  Do you know why that is?
10    A.  I do not.
11    Q.  Did you have a problem with
12 Mr. Sharts?
13        MR. WEISENFELDER: Objection. Go
14 ahead.
15        THE WITNESS: Personally, no.
16    Q.  Professionally?
17    A.  Professionally?
18        MR. WEISENFELDER: Objection. Go
19 ahead.
20        THE WITNESS: Yeah. I mean, I didn't
21 feel that that was proper practice or taking us
22 into consideration.
23    Q.  Okay. Do you have that same issue
24 with the new guy? Is it Mr. Tepe?
25    A.  Right.

Page 19

1         MR. WEISENFELDER: Objection. Go
2 ahead.
3         THE WITNESS: No.
4    Q.  All right. So he comes to you a
5 little more frequently when he's dismissing a
6 case or when he's doing anything with a case?
7    A.  Right.
8    Q.  Okay. So it would be unusual for
9 Mr. Tepe to throw out a case without conferring
10 with the officer?
11    A.  I'm not saying he hasn't, but it
12 would be unusual.
13    Q.  Okay.
14    A.  It would be rare.
15    Q.  How about the other prosecutors
16 outside Springboro in county court, how do they
17 operate?
18        MR. WEISENFELDER: Objection. Go
19 ahead.
20        THE WITNESS: They usually consult
21 with us.
22    Q.  Okay. Did you ever know a policeman
23 named Sergeant Hughes?
24    A.  No.
25    Q.  How about Officer Todd Pultz?

Page 20

1    A.  Yes.
2    Q.  I understand Pultz is no longer
3 employed here; is that right?
4    A.  Correct.
5    Q.  Do you know why that is?
6    A.  I was advised --
7        MR. WEISENFELDER: Objection. I have
8 been advised that Mr. Pultz's departure from
9 the department, that there's a confidentiality
10 agreement attached to that, so I'm going to --
11 he's answered that he's no longer here and I'm
12 going to instruct him not to answer it.
13        MR. KOLENICH: Okay. Plaintiff takes
14 exception to that. Can we go off the record?
15       (An off-the-record discussion was held.)
16    Q.  All right. How often would you say
17 you're trained on the subject of probable cause
18 to stop a vehicle?
19    A.  How often? I really couldn't say
20 that because it's -- like I said, it's various
21 with videos. It comes up in different
22 trainings.
23    Q.  Is it particularly frequently?
24 Strike that. Is it once a month?
25    A.  Could be.

Page 21

1    Q.  Could be?
2    A.  Could be.
3    Q.  What is the standard that you need
4 legally in the State of Ohio? What legal
5 standard do you have to meet before you can
6 stop a vehicle?
7    A.  Probable cause.
8    Q.  Are you sure it's not reasonable
9 suspicion?
10    A.  Reasonable suspicion?
11    Q.  You never heard that phrase?
12    A.  Yes, I have. Reasonable suspicion, I
13 have stopped people for suspicious vehicles or
14 suspicious persons.
15    Q.  So you are trained that you need
16 probable cause?
17    A.  Right.
18    Q.  Would it be particularly surprising
19 to you if I told you that that's not, in fact,
20 the case and all you need is something called
21 reasonable suspicion, that you need probable
22 cause to arrest the driver?
23    A.  Right. But probable cause would
24 be -- I'm assuming you are referring to an
25 actual traffic stop or traffic violation,

6 (Pages 18 to 21)

Page 22

1 having probable cause. Reasonable suspicion,
2 yes, reasonable suspicion for -- if it's a
3 suspicious vehicle or if there's a call coming
4 out where this matches the description of a
5 crime that has been committed.
6     Q. You've stopped people for drunk
7 driving, right?
8     A. Yes.
9     Q. And you've gone to court on these
10 cases?
11    A. Yes.
12    Q. And some lawyer grills you on why you
13 stop the car, right?
14    A. Yes.
15    Q. And then they have a separate set of
16 questions for why you arrested the driver,
17 right?
18    A. Yes.
19    Q. But you've never heard of the
20 distinction between the legal standard for
21 stopping the car and the legal standard for
22 arresting the driver?
23    A. Yes.
24    Q. You have?
25    A. (Nodding affirmatively.)

Page 23

1     Q. But you refer to both as probable
2 cause?
3     A. Both as probable cause?
4     Q. Well, you said you need probable
5 cause to stop a car.
6     A. Right, for a traffic violation.
7     Q. That's your understanding?
8     A. Right.
9     Q. Okay. So that's how you are trained?
10    A. Right.
11    Q. Okay. To the best of your -- I
12 already asked you this: As far as you know,
13 you never stopped Miracle Hurston for anything?
14    A. As far as I know.
15       MR. KOLENICH: All right. Officer
16 Faulkner, I think --
17       MR. WEISENFELDER: I think --
18       MR. KOLENICH: I'm limiting it to the
19 best of his memory.
20       MR. WEISENFELDER: I think his
21 testimony was he thinks he may have stopped him
22 but he has no specific recollection as to why.
23 Wasn't that your testimony?
24       THE WITNESS: Yeah.
25       MR. WEISENFELDER: I mean --