**21**

1 to foundation. Go ahead.
2     A. Is this a hypothetical, or did
3 it happen?
4     Q. This is the allegation of the
5 plaintiff in this case.
6     A. If it were happening, it would
7 evidence the existence of some sort of
8 problem, but I'm unable to attribute that to
9 police misconduct or the young man you're
10 alluding to; highly unusual.
11     MR. KOLENICH: Very well,
12 Mr. Sharts. Thank you. Sorry to drag you
13 down here. I have no further questions.
14     MR. WEISENFELDER: I have a
15 couple.
16     DIRECT EXAMINATION
17 BY MR. WEISENFELDER:
18     Q. Mr. Sharts, you were asked
19 earlier to reflect on stopping of older cars
20 with younger drivers. Based upon your
21 experience, typically the older the car,
22 isn't there generally more likely something
23 apparently wrong with the car, such as a
24 brake light, a taillight, something that

**22**

1 would give an officer reason to stop the car?
2     A. Yes.
3     Q. Typically -- and again, we're
4 speaking in generalities, that younger
5 drivers, because they have not matured, are
6 not the better drivers, and they may commit
7 more infractions, again, giving an officer
8 reason to stop the car?
9     A. They tend to be more impatient,
10 yes, more impatient in traffic.
11     Q. So the mere fact -- whether it's
12 Springboro or any police department, if we
13 look at statistics, which we haven't done.
14 These are all hypotheticals. You would not
15 be surprised to see that the majority of
16 drivers stopped either for a faulty car,
17 something faulty with a car, or an
18 infraction, a driving infraction, would tend
19 to be younger drivers?
20     A. I would not be surprised if they
21 were disproportionately represented within
22 the statistics.
23     Q. And you mentioned earlier that
24 the officers -- the term I'm not familiar

**23**

1 with is "flipping tags." Is that the phrase?
2     A. Flipping plates.
3     Q. Flipping plates, pardon me.
4     A. My phrase.
5     Q. Is that synonymous with running
6 tags?
7     A. Yes.
8     Q. Where, for whatever reason, an
9 officer observes a vehicle, and for whatever
10 reason, elects to obtain additional
11 information either about the car or the
12 driver through one of the means which you
13 described earlier?
14     A. Because the plates are in plain
15 view, they need no reason.
16     Q. Other than there's something
17 that prompts the officer's attention?
18     A. Could be wishful thinking as
19 well, hopeful thinking.
20     Q. But that's not a violation of
21 any rule of law that you're aware of, is it?
22     A. No.
23     MR. WEISENFELDER: That's all I
24 have.

**24**

1     MR. KOLENICH: Just one
2 follow-up.
3     RECROSS-EXAMINATION
4 BY MR. KOLENICH:
5     Q. In answering Mr. Weisenfelder's
6 questions, did you intend to amend or reverse
7 your answer to me that it was highly unusual
8 that the plaintiff should be stopped so many
9 times in a short period of time?
10     A. No. That would be unusual.
11     Q. And indeed indicative if
12 something is wrong, you couldn't pin down
13 exactly what that something might be, but --
14     A. Given the information with which
15 you have equipped me, which is none at all
16 except to assert a young man was stopped
17 eight times within a short period of time,
18 I'm unable to further analyze why that
19 occurred. It's just unusual.
20     Q. Well, let me try to be a little
21 more specific to the extent that I can here
22 today. He's alleging he was stopped seven to
23 eight times within a couple of months. On
24 most of those occasions, he was not written

25

1  any citation whatsoever, but was given a
2  lecture of varying degrees of civility by the
3  policeman.
4       On the occasion where he was
5  ticketed, he was ticketed twice, one of
6  which -- he was ticketed a total of three
7  times, one of which resulted in a conviction
8  and therefore, obviously, is not part of this
9  lawsuit.
10      On two other occasions, you
11 dismissed one of the cases in its totality,
12 and your successor dismissed the other.
13      A.   What is the question in all
14 that?
15      Q.   With those additional facts, do
16 you still find that unusual and indicative of
17 a problem?
18      MR. WEISENFELDER: Objection as
19 to the word "unusual."
20      A.   Is this young man, looking at
21 the Subpoena, Miracle Hurston?
22      Q.   Yes, he is.
23      A.   I have no recollection at all of
24 having ever dealt with Miracle Hurston for

26

1  any reason whatsoever. And today, I cannot
2  explain why I would have dismissed a
3  Complaint, or even verify that I did.
4       It seems unusual that the same
5  person would have been repeatedly contacted,
6  for whatever reason, unusual; but in all
7  this, I don't know who the bad guy is.
8       MR. KOLENICH: Okay. Thank you.
9  Nothing further.
10      REDIRECT EXAMINATION
11 MR. WEISENFELDER:
12      Q.   The essence of unusualness might
13 be removed if the person had been stopped
14 seven, eight times was doing something to
15 make sure that he was stopped?
16      A.   Well, absolutely.
17      MR. WEISENFELDER: That's all I
18 have.
19      THE WITNESS: I waive signature.
20
        (Signature waived.)
21      JOHN E. SHARTS

22
        (DEPOSITION CONCLUDED AT 1:45 P.M.)
23           - - -
24

M. Sue Lopreato Reporting
Phone (513) 871-9588 * Fax (513) 871-9566